RECEIVED
IN LAKE CHARLES, LA

FEB 13 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

IN THE MATTER OF SOUTH
LOUISIANA CEMENT, INC. AS
BAREBOAT CHARTERER OF
BARGES LTD 148, LTD 217, LTD 239,
LTD 121, AND LTD 404
PETITIONING FOR EXONERATION
FROM OR LIMITATION OF
LIABILITY
: DOCKET NO. 03 CV 0778

: JUDGE MINALDI

: MAGISTRATE JUDGE WILSON

## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment filed by third-party defendant, Equipment Chartering Company, Inc. ("Equipment Chartering") [doc. # 41].[1] This case arises out of an incident that occurred on or about October 30 or 31, 2002, when six barges under bareboat charter to plaintiff, South Louisiana Cement, Inc. ("SLC") broke free from their moorings at SLC's cement unloading facility on the banks of English Bayou in Lake Charles. After drifting down river, five of the six barges came in contact with and allegedly caused damage to the United States Corps of Engineers' Salt Water Barrier on the Calcasieu River. The barges were delivered to SLC's facility and moored by a tug known as the M/V LEISLIE GEISMAR five days before the incident.

On August 24, 2003, the United States filed a claim in Admiralty against SLC for

---

[1] Originally, Equipment Chartering had also moved for Rule 11 sanctions against South Louisiana Cement, Inc. However, it has since withdrawn that motion.

property damages to the Salt Water Barrier [doc. 13]. On August 20, 2004, SLC filed a Rule 14(c) tender adverse to PBC Services, Inc., ("PBC"), which operated and maintained the cement unloading equipment at SLC's facility, and Equipment Chartering, the owner of the M/V LESLIE GEISMAR and employer of its captain and crew. SLC seeks exoneration from or alternatively limitation of liability, alleging that any damage to the property of the United States was caused by PBC and/or Equipment Chartering. On March 22, 2005 Equipment Chartering moved for summary judgment, requesting dismissal from this suit. By a May 5, 2005 Order of this court, PBC's Rule 56(f) Motion to Continue Hearing on the Motion for Summary Judgment of Equipment Chartering was granted, continuing the hearing until after the depositions of Equipment Chartering employees and the 30(b)(6) deposition of Equipment Chartering, had been completed. These depositions have since been taken and the present motion is now ready for disposition.

*Background*

On October 22, 2002, the M/V LESLIE GEISMAR, captained by Charles Bunch picked up six loaded barges from a facility in Laplace, Louisiana for delivery to SLC's facility. The arrangement for the delivery of these barges had been made through L&T Marine, Inc., a marine broker which served as the liaison between Equipment Chartering and SLC.[2] The tow was attached to the M/V LESLIE GEISMAR using wire rope cable with two inch polyester "safety" lines over the wire rope with the barges arranged end to end, three long and two wide.[3] The barges traveled down the Mississippi River to the Intracoastal Waterway and then North on the

---

[2] L&T Marine, Inc. is not a party to this suit.

[3] SLC's Memorandum in Opposition to Motion for Summary Judgment, Exhibit A, pp. 42-45, 48, 50-54.

Calcasieu River.[4] The tow stopped just before the Salt Water Barrier at mile 33 on the river in order to reassemble the tow since only two barges can pass through its locks at one time.[5]

The M/V LESLIE GEISMAR arrived at the SLC facility with the first two barges at approximately 6:00 p.m. on Friday October 25, 2002.[6] There was no one present when the tug arrived and between three to five barges were already moored at the facility.[7] Before mooring the first two barges, Captain Bunch contacted Equipment Chartering Operations Manager, Lane T. DeBardeleben, Jr. to express his concern over leaving the barges in such a crowded facility under the prevailing river conditions.[8] Mr. DeBardeleben immediately called Lonnie Link, President of L&T Marine who in turn contacted Mr. Turner Casey, General Manager of SLC, at Mr. Casey's home and notified him of Captain Bunch's concern.[9] According to Mr. Link's Affidavit, Mr. Casey told him to instruct Captain Bunch that it was the regular practice of the facility to have ten or more barges tied up at any given time, that he should secure the barges as best as he could and that Mr. Casey would send a man out to check everything the following day.[10] After receiving this message, Captain Bunch and his crew moored the first two barges. The next two

---

[4] SLC's Opposition Memo, Exhibit A, pp. 58-60.

[5] *Id* at pp. 60-60.

[6] *Id* at p. 70.

[7] *Id* at p. 74.

[8] *See Rule 30(b)(6) Deposition of Equipment Chartering*, p. 23, l. 16-25. (Mr.DeBardeleben, Jr. was serving as dispatcher that evening and testified to receiving a call from Captain Bunch in which Captain Bunch explained that SLC had several barges already tied off at the facility and that he felt that, from his interpretation of the rising river conditions, the additional six barges would be too many for the number of available shore lines).

[9] *Affidavit of Lonnie Link*, doc. #82-1 p. 2.

[10] *Id.*

barges were delivered by Captain Bunch from 6:00 a.m. to 12:00 p.m. on Saturday October 26, 2002. The tug's other captain, Mac Nelson, relieved Captain Bunch at 12:00 p.m. and completed delivery of the last two barges. Following the completed delivery, the M/V/ LESLIE GEISMAR departed and Equipment Chartering was not contacted again until after the accident.

SLC alleges that on or about October 30, 2002 the barges in question were inspected by one or more PBC employees and found to be secure.[11] There is conflicting testimony as to whether or not PBC employees moved any of the six barges delivered by Equipment Chartering during the five day period between delivery and the breakaway incident.[12]

*Summary judgment standard*

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and that the moving party is entitled to summary judgment as a matter of law.[13] When the nonmoving party has the burden of proof on an issue, the movant must state the basis for the motion and identify those portions of the pleadings, depositions, admissions, answers to interrogatories, together with affidavits, that demonstrate the absence of a genuine issue of material fact.[14] A mere conclusory statement that the other side has no evidence is not

---

[11] SLC's Third Party Complaint Pursuant to Rule 14(c), ¶ 8.

[12] Exhibit B p.78-83; Exhibit D p. 54; Exhibit E p. 52, 61.

[13] Fed.R.Civ.P. 56(c); See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-88, 106 S.Ct. 1348, 1355-57, 89 L.Ed.2d 538 (1986).

[14] *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Topalian v. Ehrman*, 954 F.2d 1125, 1131-32 (5th Cir.1992), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

enough to satisfy a movant's burden.[15]

Once the movant has shown the absence of material factual issues, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts demonstrating that there is a genuine issue for trial.[16] The Court must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment.[17] However, a party opposing summary judgment may not rest on mere conclusory allegations or denials in his pleadings.[18]

*Law and Analysis*

There is long-standing rule of law that a tug is bound to properly moor and make fast an unmanned barge it delivers and that drifting which occurs within a short time thereafter presumptively establishes fault on the part of the mooring vessel.[19] When this presumption operates, the duty of producing evidence shifts to the mooring vessel to show that it exercised due care.[20] However, "[t]he drifting vessel presumption is not designed for allocation of liability between the injurers, as distinct from the allocation of the loss between them and their victims, and although occasionally mentioned in the former context as well it does not control decision there." *Rodi Yachts, Inc. v. National Marine, Inc.* 984 F.2d 880 (1993), *886 -887 (C.A.7

---

[15] See *Celotex*, 477 U.S. at 328, 106 S.Ct. at 2555.

[16] Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

[17] *Eastman Kodak v. Image Technical Services*, 504 U.S. 451, 456-58, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

[18] Fed.R.Civ.P. 56(e); see also *Topalian*, 954 F.2d at 1131.

[19] *Pasco Marketing, Inc. v. Taylor Towing Service, Inc.* 554 F.2d 808, 811 (C.A.Mo. 1977) (citations omitted).

[20] *Id.*

(Ill.),1993) (citations omitted). Thus, the ultimate burden in this case remains with SLC to show that a party other than SLC was responsible for any damage caused by the drifting barges.

When the opposing party bears the burden of proof at trial, a party seeking summary judgment need not submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the opposing party's case. *See Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir. 1991). The purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-889, 110 S.Ct. 3177,**3188 - 3189 (1990).

SLC and PBC have failed to submit any competent summary judgement evidence to contradict Equipment Chartering's contention that it fulfilled its duty in mooring the barges to the satisfaction of SLC. Instead, their arguments focus on questions regarding the manner in which the barges were moored by the crew of the M/V LESLIE GEISMAR on October 25, 2002 and October 26, 2002 and whether PBC employees were capable of performing a meaningful inspection during the intervening five-day period between delivery and the breakaway. Under the circumstances of this case, these questions are immaterial to the issue of Equipment Chartering's liability.

The undisputed facts show that upon arriving at SLC's facility, Captain Bunch communicated to Turner Casey (via Lonnie Link) his concern regarding securing the barges under the prevailing conditions. Mr. Casey, with full knowledge of the potential risks, then instructed Captain Bunch to leave them anyway and he would send a man out to check

everything,[21] thereby relieving Captain Bunch of responsibility for the safety and security of the barges. In its Petition, SLC alleges that the barges were inspected by PBC employees during the five days they remained moored at the facility and were found to be secure.[22] Rather than contesting the fact that an inspection occurred, PBC merely argues that its employees were incapable of performing a meaningful inspection and that, therefore, Equipment Chartering cannot be absolved from liability unless it can show conclusively that its moorings did not cause the breakaway. Even if it were true that PBC could not properly inspect the barges on their own, given Mr. Casey's discussion with Captain Bunch, responsibility for the safety of the barges would fall to SLC rather than Equipment Chartering.

The recognized rule of law is that a tug's duty is ended when she has delivered her tow to the agreed and proper destination, has moored her in an apparently safe position and in an apparently safe berth and has seen that she is moored properly under the prevailing circumstances. *Hebert v. Barge ABL-22* 221 F.Supp. 725, *727 (D.C.La. 1963) (citations omitted). Mr. Casey's instructions coupled with the fact that no party contacted Equipment Chartering during the intervening five days to complain about the moorings, leads to only one sensible conclusion: that Equipment Chartering fulfilled its duties to the satisfaction of SLC and that liability for damages caused by the breakaway must fall to a party other than Equipment Chartering.

Even if considered in the light most favorable to PBC and SLC, there is no evidence to suggest that Equipment Chartering can be held liable for damages caused by the drifting barges.

---

[21] *Affidavit of Lonnie Link* [doc. 82], at p. 2; see also Deposition of Captain Charles Bunch, p. 98 l. 7-9.

[22] *See* SLC's Third Party Complaint Pursuant to Rule 14(c), ¶ 8.

Therefore, for the reasons stated herein, the Defendants' Motion for Summary Judgment is GRANTED.

Lake Charles, Louisiana, this 13 day of February, 2006.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE